IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Michelle L. Black-Hosang,

    Plaintiff,

  vs.                                           Case No. 2:01-cv-00623
                                                            JUDGE GRAHAM

Ohio Department of Public Safety,

    Defendant.


**MEMORANDUM OPINION AND ORDER**

    This is a 42 U.S.C. §1983 action in which the plaintiff alleges that she was falsely arrested by defendant Trooper James R. Mendenhall of the Ohio State Highway Patrol.  This case proceeded to jury trial on August 29, 2005, and on August 30, 2005, the jury returned a verdict in favor of the plaintiff, awarding her compensatory damages in the amount of $100,000, and punitive damages in the amount of $250,000.  The matter is now before the court for a determination of the defense of qualified immunity.

    Plaintiff was employed by the State of Ohio Bureau of Motor Vehicles as a driver's license examiner at the Town & Country examination facility in Columbus, Ohio. Mendenhall was investigating the fraudulent issuance of commercial driver's licenses (CDLs) by examiners working at that office.  In the course of the investigation, the state patrol interviewed all of the driver's license examiners at the Town & Country branch. Plaintiff was interviewed by Mendenhall on June 10, 1999, and cooperated fully in the investigation.

    Mendenhall later came to suspect that plaintiff had falsified

written test scores and facilitated the execution of a fraudulent driving skills test exemption form in order to permit an individual by the name of Gervase Flipping to obtain a CDL. Plaintiff had processed Flipping's written examination and issued him a temporary permit, which she signed, sealed and completed with her unit number. Upon being interviewed by Mendenhall, Flipping admitted that he had obtained his CDL by signing a fraudulent exemption form.

Flipping told Mendenhall that he was approached by an unidentified black female at a bar who offered to assist him in obtaining his CDL without taking the driving skills test in return for a payment of $200.00. Mendenhall showed Flipping a photograph of the plaintiff and Flipping told him that she was not the person who provided him with the false exemption form. Plaintiff is an African-American, whose skin color is medium brown. She suffers from a skin condition which affects her skin pigmentation, producing large irregular patches of light, nearly white, coloration. This condition is readily apparent on her hands, arms and neck. Mendenhall asked Flipping if the person who assisted him in fraudulently obtaining his CDL had such a condition, and he replied that she did not.

The only physical evidence that Mendenhall had prior to arresting plaintiff was the temporary license issued to Flipping by the plaintiff, and the fraudulent exemption form which had her unit number written on it. Plaintiff admitted that she had issued the temporary license to Flipping after he successfully passed the written examinations, and she admitted that the license bore her signature, seal and unit number in her handwriting. However, she

2

denied having any involvement with the exemption form which permitted him to obtain his CDL, and she denied that the unit number appearing on that exemption form was in her handwriting. There are apparent differences between the handwriting of the unit number on the form admittedly completed by the plaintiff, and the unit number written on the fraudulent exemption form. Mendenhall did not obtain a handwriting analysis of these two documents even though a handwriting expert was available to him.

Mendenhall claimed that he believed that plaintiff was involved in fraudulent activity with Flipping, because Flipping told him during his interview that he had not taken the written examination. At trial, Flipping denied that he told Mendenhall that he had not taken the written examination. The written statement which Mendenhall obtained from Flipping did not say that Flipping had not taken the written examination. The following interrogatory was submitted to the jury:

> 4) Prior to plaintiff's arrest on June 30, 1999, did Mr. Flipping tell defendant Mendenhall that he had not taken the written examination for a CDL license?

ANSWER: No

Mendenhall further testified that he believed the plaintiff was involved in fraudulent activity because of her actions and statements at a second interview, which he attempted to conduct of her on June 16, 1999. According to Mendenhall, he asked plaintiff to be seated at a table on which he had placed a file with Flipping's name prominently displayed on the cover. He said that when he began to read plaintiff her Miranda rights, she became agitated and argumentative. According to Mendenhall, plaintiff

indicated that she knew Flipping. She then said that she wanted a lawyer and refused to make any further statements. Plaintiff, in her testimony, admitted that she became upset when Mendenhall began reading her Miranda rights, said she wanted a lawyer, and refused to make any further statements. Plaintiff, however, denied that there was any discussion of Mr. Flipping, and denied that she knew him. The following interrogatory was submitted to the jury:

> 5) At plaintiff's second interview on June 16, 1999, did plaintiff indicate to defendant Mendenhall that she knew Gervase Flipping?

ANSWER: No

Before charging plaintiff with a crime and arresting her, Mendenhall had a telephone conversation with Assistant Prosecutor Joe Garber of the Franklin County Prosecutor's Office. Mr. Garber knew about charges which had been filed against two other license examiners and he had provided advice and assistance to the State Highway Patrol investigators, which resulted in a controlled purchase of a CDL from one of these employees while under surveillance. That arrest also led to the issuance of a search warrant for the home of Kenneth Hairston, who was the broker or middleman for the sale of the fraudulent CDLs. Additional driver's license documents were found in a night stand in Hairston's home and these included documents relating to Mr. Flipping. Mendenhall told Garber that he had Flipping's temporary license signed and sealed by the plaintiff, indicating that Flipping had passed the written exam. Mendenhall also told Garber that he had an exemption form with the plaintiff's unit number which referenced the same fictitious employer used in all of the other fraudulent

4

exemption forms, and that this form had plaintiff's unit number written on it. He also told Garber that Flipping told him that he had not taken the written exam and that plaintiff had made statements indicating that she knew Flipping. Mendenhall did not tell Garber that he had shown Flipping a photograph of the plaintiff, and that Flipping had told him that she was not the person who assisted him in obtaining his fraudulent license. Mendenhall did not tell Garber that Flipping had denied that the woman who assisted him had an obvious skin condition. Mendenhall testified that Garber agreed that he should proceed to file a criminal complaint against the plaintiff and put her under arrest.

Based on the jury's answers to interrogatories, it is apparent that Mendenhall provided Garber with false information about Flipping not taking the written exam, and that plaintiff knew Flipping. Furthermore, Mendenhall admits that he did not disclose exculpatory information to Garber when he failed to inform him that when he had shown Flipping a photo of plaintiff, Flipping had said she was not the person who sold him a CDL, and that the person who sold him a CDL did not have a skin condition.

Qualified Immunity

Under the doctrine of qualified immunity, "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Whether qualified immunity is applicable to an official's actions is a question of law.

5

Dickerson v. McClellan, 101 F.3d 1151, 1157 (6th Cir. 1996).

Where a violation of a constitutional right has been alleged or established, the court must determine whether the constitutional right in question was clearly established at the time of the alleged event, such that a reasonable official would understand that what he is doing violates that right. Saucier v. Katz, 533 U.S. 194, 201 (2001). Whether an official may prevail in his qualified immunity defense depends upon the objective reasonableness of his conduct as measured by reference to clearly established law. Davis v. Scherer, 468 U.S. 183, 191 (1984).

For a constitutional right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987); Ewolski v. City of Brunswick, 287 F.3d 492, 501 (6th Cir. 2002). It is not necessary that "the very action in question has previously been held unlawful," but "in light of pre-existing law the unlawfulness must be apparent." Anderson, 483 U.S. at 640. The relevant question is whether the state of the law at the time of the incident gave defendant fair warning that his alleged acts were unconstitutional. Hope v. Pelzer, 536 U.S. 730 (2002). In determining whether a constitutional right was clearly established, this court must look first to the decisions of the Supreme Court, then to decisions of the Sixth Circuit and other courts within this circuit, and finally to the decisions of other circuits. Daugherty v. Campbell, 935 F.2d 780, 783 (6th Cir. 1991). Plaintiff bears the burden of showing that the law was clearly established at the time of the offensive conduct. Hughes v. City of North Olmsted, 93 F.3d 238,

6

241 (6th Cir. 1996).

Fourth Amendment

The Fourth Amendment to the Constitution of the United States provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Plaintiff claims that defendant Mendenhall violated her Fourth Amendment rights by arresting her without probable cause. The standard for probable cause to arrest is clearly established law. The Fourth Amendment requires "a fair and reliable determination of probable cause" as a condition of an arrest. Criss v. City of Kent, 867 F.2d 259, 262 (6th Cir. 1988). "Generally, probable cause exists when the police have 'reasonably trustworthy information ... sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense.'" Gardenhire v. Schubert, 205 F.3d 303, 315 (6th Cir. 2000) (quoting Beck v. Ohio, 379 U.S. 89, 91 (1964)). An officer cannot turn a blind eye toward potentially exculpatory evidence known to him in determining if probable cause exists. Gardenhire, 205 F.3d at 318.

In the context of an unlawful arrest claim, qualified immunity shields the arresting officer if a reasonable officer could have believed the arrest to be lawful in light of clearly established law and the information possessed by the arresting officer. Anderson, 483 U.S. 635, 641 (1987). The inquiry is an objective

7

one, based on what conduct a reasonable police officer would believe to be lawful based on the information then possessed by the officer, not on what the officer subjectively may have believed. Anderson, 483 U.S. at 641.

    The court finds that no reasonable officer could have believed the arrest of the plaintiff to be lawful in light of clearly established law and the information possessed by defendant Mendenhall. The temporary license issued to Flipping by the plaintiff and bearing her signature, seal and unit number was regular and legitimate on its face. There was nothing about it that would raise any suspicion that it had been fraudulently issued. Specifically, there was nothing about it which would suggest that Flipping had not taken and passed the written examinations as certified by Ms. Black-Hosang. The fact that these papers were found in Hairston's residence would be consistent with Flipping having given them to the woman who offered to assist him in obtaining a CDL license without taking the driving test. Hairston had been identified as the individual who was acting as a middleman. The presence of plaintiff's unit number on the fraudulent exemption form was insufficient, standing alone, to create a reasonable suspicion that the plaintiff was involved in issuing a fraudulent CDL to Flipping. The unidentified woman who assisted Flipping could have readily ascertained plaintiff's unit number from Flipping's temporary license. The handwritten numbers on the exemption form are not identical in appearance to plaintiff's handwritten numbers on the temporary license. Mendenhall did not seek a handwriting analysis to compare the handwritten numbers on these two documents. Thus, the evidence

that plaintiff was involved with Flipping's fraudulent exemption form was inconclusive at best. Mendenhall's claim that he believed plaintiff had fraudulently issued a temporary license to Flipping because Flipping told him that he had not taken the written test is belied by the fact that the jury found that Flipping told him no such thing. Likewise, Mendenhall's claim that plaintiff's statements reasonably led him to believe that she knew Flipping was rejected by the jury. Not only was there a lack of evidence to constitute probable cause, but there was significant exculpatory evidence which Mendenhall chose to ignore and failed to disclose to the prosecutor when he sought advice about arresting the plaintiff. Flipping was steadfast in his denial that plaintiff was the woman who assisted him in obtaining his fraudulent CDL.

Mendenhall's testimony was fraught with contradictions. At one point, he maintained that finding Flipping's "red and white" forms bearing plaintiff's seal and signature during the search of Hairston's home was evidence of plaintiff's involvement in the fraud because the "red and white" forms were supposed to be destroyed by the examiner and not returned to the applicant. It is unclear whether Mendenhall actually believed this at the time of plaintiff's arrest or whether it was simply mistaken testimony given at the time of trial. In any event, it was completely incorrect, inasmuch as the "red and white" forms constitute the temporary driving permit which is issued to the applicant after passing the written tests. Plaintiff explained this to Mendenhall during her first interview, and anyone who took the time to read the forms and familiarize themselves with the process would immediately recognize that it would be wrong to believe that the

9

"red and white" forms which were signed and sealed by the examiner and constituted a temporary driving permit would be destroyed by the examiner.

Defendant argues that he is entitled to qualified immunity because he consulted with an assistant prosecutor prior to obtaining the arrest warrant. Pre-arrest consultation with a prosecutor may lend reasonableness to an officer's conclusion that probable cause exists, and thus may help to establish qualified immunity. See, e.g., Kijonka v. Seitzinger, 363 F.3d 645, 648 (7th Cir. 2004); Dixon v. Wallowa County, 336 F.3d 1013, 1019 (9th Cir. 2003); E-Z Mart Stores, Inc. v. Kirksey, 885 F.2d 476, 478 (8th Cir. 1989). The Sixth Circuit has held that reliance on the advice of counsel may constitute "extraordinary circumstances" under Harlow, 457 U.S. at 818-819, which would entitle a defendant to qualified immunity even where he would otherwise not be entitled to it. See York v. Purkey, 14 Fed.Appx. 628, 2001 WL 845554 (6th Cir. July 20, 2001).

However, consultation with an attorney does not automatically result in an award of qualified immunity, but rather is only one factor, among many, that enters into the totality of the circumstances relevant to the qualified immunity analysis. Cox v. Hainey, 391 F.3d 25, 35 (1st Cir. 2004). Further, reliance on the advice of counsel will not support a finding of qualified immunity where complete information was not provided to the advising attorney. Id. at 36; York, 2001 WL 845554 * 5.

Here, Mendenhall omitted material information when he discussed the case with the assistant prosecutor. He failed to inform Garber that when he showed Flipping a photo of plaintiff,

10

Flipping stated that she was not the person who sold him a CDL, and further that Flipping stated that the person who sold him the CDL did not have a skin condition.  The jury also found that Mendenhall provided Garber with false information about Flipping not taking the written exam, and that plaintiff knew Flipping.  Under these circumstances, Mendenhall's reliance on the advise of counsel does not weigh in favor of the qualified immunity defense.

No reasonable officer in the position of defendant Mendenhall could have concluded that probable cause existed to arrest the plaintiff.  Mendenhall is not entitled to qualified immunity.

The Clerk shall enter final judgment in accordance with the jury's verdict, rendering judgment in favor of the plaintiff, and against the defendant, James R. Mendenhall, for compensatory damages in the amount of $100,000.00, and for punitive damages in the amount of $250,000.00.  The cost of this action shall be assessed against defendant.

It is so ORDERED.

                                              s/James L. Graham  
                                              JAMES L. GRAHAM  
                                              United States District Judge

DATE: September 2, 2005